FILED
2011 Mar-07  AM 11:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES RUBEN ROUSSEAU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. CV-09-S-1069-NE** |
| | ) | |
| **THE HTP GROUP, A Division of** | ) | |
| **Carrier Commercial Refrigeration,** | ) | |
| **Inc., d/b/a Carrier Heat Transfer** | ) | |
| **Products,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, James Rousseau, filed this case on May 29, 2009, asserting claims against his former employer, The HTP Group, a division of Carrier Commercial Refrigeration, Inc., d/b/a Carrier Heat Transfer Products ("Carrier"), under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA").[1]  The case currently is before the court on defendant's motion for summary judgment on all of plaintiff's claims.[2]  Upon consideration of the motion, briefs, and evidentiary submissions, this court concludes that the motion is due to be denied.  The bases for that conclusion are explained in the remainder of this opinion.

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 24.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

---

[3] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS[4]

Carrier is in the business of providing high technology heating, air conditioning, and refrigeration solutions.[5] Until recently, Carrier operated a plant in Scottsboro, Alabama, where it manufactured refrigeration condensing units, evaporator coils, and cooling condensers for the food service, food retail, and other commercial, non-consumer markets.[6]

Carrier distributes a document entitled "Hourly Employee Guidelines" to each of its hourly employees. Plaintiff signed a form acknowledging his receipt of a copy

---

[4]In its reply brief, defendant did not respond, paragraph-by-paragraph, to any of the proposed findings of facts stated by plaintiff in his brief. *See* doc. no. 27 (reply brief). Accordingly, all of plaintiff's proposed facts are deemed admitted for summary judgment purposes. *See* doc. no. 13 (Uniform Initial Order), at 17-18.

[5]Defendant's evidentiary submission, Exhibit C (Declaration of Renee Knight), at ¶ 4.

[6]*Id.* at ¶ 3.

of the Hourly Employee Guidelines on March 13, 2006, his first day of work as a coil brazier at Carrier's Scottsboro facility.[7]   The Guidelines state the following with regard to "Leave-of-Absences":

> Carrier offers several types of Leaves of Absences based on an employee's circumstances, need, pertinent State and Federal requirements and the needs of the business.  A leave-of-absence is an absence from work for an agreed upon period of time, requested by an employee, and authorized by the Company.  A leave-of-absence will be granted only when there is a definite necessity and not just a convenience.  Taking employment elsewhere is not grounds for a leave and will result in immediate termination.

> There are several types of leaves-of-absence available.  They include, but are not limited to bereavement, Family Medical Leave, jury duty, military, and short-term disability.  It should be noted that the Company does not generally grant "personal" leaves of absence. *Failure to return to work at the end of a covered leave period will be considered as a voluntary termination.  Requests for an extension of a leave must be made and approved in writing before the expiration of the original leave*.  Some leaves will require a written release to return to work from a physician.  The specific details of each type of leave may be obtained from the Human Resources Dept.[8]

With regard to Family and Medical Leave under the statute upon which plaintiff's claims are based, the Hourly Employee Guidelines state:

> Family Medical Leave is available to employees who have worked for Carrier for at least 12 months and have worked at least 1,000 hours over the previous 12 months.  Family Medical Leave may be taken

---

[7]Defendant's evidentiary submission, Exhibit A (Deposition of James Rousseau), Exhibit 8 (Copy of Hourly Employee Guidelines), at 1; *see also* Rousseau Deposition, at 52.

[8]Rousseau Deposition, Exhibit 8 (Copy of Hourly Employee Guidelines), at 9 (emphasis supplied).

for one or more of the following reasons: 1) birth of your child and care for your child following birth, 2) care for your child following adoption, 3) care for a child placed in your foster care, 4) care for your child, spouse, or parent who has a serious health condition, or 5) your own serious health condition. *This leave is for **a maximum of 16 weeks annually*** (calculated on a rolling 12-month basis from the last FMLA related leave) for any single or combined purpose. FMLA can be taken in consecutive weeks or intermittently depending on treatment or required care of a family member. FMLA will run concurrently with short-term disability when used for an employee's illness.

To apply for FMLA employees must obtain the proper forms from the Human Resources Department, complete them fully, and return them to Human Resources. *The time granted and other pertinent conditions will be recorded in the written authorization. Employees are required to give at least two weeks' advance notice of the date he/ she intends to return to work to the Human Resources Department.* Any questions regarding this policy should be referred to the Human Resources Department.[9]

It should be observed that Carrier's family and medical leave policies provide for up to sixteen weeks of leave from work, instead of the usual twelve weeks allowed by the FMLA, because Carrier's headquarters are located in the state of Connecticut, which has adopted a state law allowing each employee a total of sixteen weeks of unpaid leave over a twelve-month period.[10]

In May of 2007, plaintiff developed a severe rash on his legs and severe swelling of his face as a result of being exposed to fumes at work. Plaintiff was

---

[9]*Id.* (all emphasis supplied).

[10]Knight Declaration, at ¶ 6.

hospitalized for approximately one week to treat his condition.[11]  On Tuesday, May

29, 2007,[12] plaintiff requested medical leave from his job by submitting the following

three forms: (1) a "Request for Family Medical Leave of Absence (FMLA)"; (2) a

"Notice of Intent to Return from Leave"; and (3) a "Request for Leave-of-Absence."

The first form — the "Request for Family Medical Leave of Absence (FMLA)" —

stated:  "Under the FMLA you have the right for *up to 12 weeks* of unpaid leave in

a 12 month period for: . . . [a] serious health condition that makes you unable to

perform the essential functions of your job . . ."[13]  Plaintiff stated that he needed to

take leave because he had a "staff [sic] infection and a secondary allergic reaction to

something that caused a bad rash on face, neck, arms, back of neck."[14]

   With regard to the second form — the "Notice of Intent to Return from Leave,"

plaintiff indicated that he *did* intend to return to work at the conclusion of his leave,

and he also acknowledged that

   restoration to employment at the conclusion of my leave is subject to
   these conditions:

      1.    If the leave is for my illness, I must provide a written
            certification from my physician that I am able to resume

---

[11]Rousseau Deposition, at 66-68.

[12]Monday, May 28th, was Memorial Day, a national holiday, in 2007.

[13]Plaintiff's evidentiary submission, Exhibit 4, at 1 ("Carrier-Scottsboro Request for Family Medical Leave of Absence (FMLA)") (emphasis supplied).

[14]*Id.*

my regular job duties.

2.      The Company will make every effort to return me to the same job and shift that I left, or if it is unavailable for some reason, I will be placed in an equivalent position with equivalent pay and benefits, unless reduction in force and/or job elimination rules govern otherwise.

3.      I understand that I will not accrue any employment benefits during my leave unless they are otherwise expressly provided by Company policy.

4.      I also realize that the Company will maintain me on their group insurance policy(s), but that I will have to maintain any premium payments required of me.  I have been advised of this fact and I am aware that I will be required to make payment arrangements prior to the beginning of my leave.  I understand that my failure to make these premium payments will jeopardize my continued coverage(s), just as they would if I failed to make them as an active employee.

5.      *When on extended Medical/FMLA leave, notification must be received a minimum of every 30 days informing Carrier of my medical status and intent to return to work.*

6.      *I further understand that if I fail to return to work after my doctor has released me to full duty it will be considered voluntary termination on my part.*[15]

With regard to third form submitted by plaintiff the "Request for Leave-of-Absence," plaintiff indicated that he was requesting both "Medical Leave" and "Family Medical Leave."  The start date for plaintiff's leave was indicated to be May

---

[15]*Id.* at 2 (Notice of Intent to Return from Leave) (emphasis supplied).

25, 2007 — *i.e.,* the Friday preceding plaintiff's May 29th request for leave — and the date his leave was due to expire was indicated to be Friday, August 17, 2007, or exactly twelve weeks after the leave period began.  Plaintiff also acknowledged that the following conditions would apply while he was on his leave of absence:

1.  *If I fail to report to work by the Return to Work date or fail to request an extension of leave before the date leave expires, it will be considered a voluntary resignation.*

2.  Accepting employment elsewhere, except by special permission, will result in immediate dismissal.

3.  *Requests for extension of this leave must be made in writing prior to the expiration of the original leave.  Medical documentation as to the necessity of the extension must be provided.*

4.  The company may require periodic recertification during the leave and may request a 2nd opinion at the company's expense. If the 1st and 2nd opinions differ, the company may require a 3rd whose opinion will be binding.

5.  In order to maintain continuous group insurance coverage, arrangements for payment must be made prior to the commencement of the leave.  I understand that I am to reimburse the company for my employee contributions to these plans whether I return or not.

6.  *Doctor's certification is required.*

7.  Doctor's certification, along with FMLA application required.

8.  When on extended Medical/FMLA leave, *notification must be received a minimum of every 30 days*, or sooner if my condition changes, informing Carrier of my medical status and intent to

return to work.

9.     It is my responsibility to call **Liberty Mutual at 1-800-243-8135 OR** *submit your claim via our website:* ***www.mylibertyclaim.com.***

10.    *Prior to my return to work I must provide Carrier with a medical release/certification.*[16]

Plaintiff acknowledges that he signed the third form — the "Request for Leave of Absence" — and he also acknowledges checking the boxes to request both "Medical Leave" and "Family Medical Leave."  However, he disputes that *he* wrote on the form that his leave would begin on May 25, 2007, and end on August 17, 2007.  In fact, plaintiff testified in his deposition that he does not know who filled in those dates, and he does not remember if he saw them being filled in.[17]

Carrier conditionally approved plaintiff's requests for leave, subject to his providing a completed healthcare certification form.[18]  On June 4, 2007, plaintiff's physician completed a "Certification of Health Care Provider" form prepared by the U.S. Department of Labor.  The form required plaintiff's physician to "State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity if

---

[16]*Id.* at 3 (Carrier-Scottsboro Request for Leave-of-Absence form) (all emphasis in ¶ 9 in original; all other emphasis supplied).

[17]Rousseau Deposition, at 78-81.

[18]Knight Declaration, at ¶ 9.

different.).["19] In the space provided for answers to that question, plaintiff's physician wrote: "appx 8-12 wks" and "**12 wks = 8/17/07**" — *i.e.,* **the ending date inscribed on plaintiff's forms.**[20] On another page of the form, just above the physician's signature, but not in response to any particular query, the physician wrote: "(Exfoliative Dermatitis) o/t work since 5/25/07, 8-12 wks."[21]

On June 13, 2007, Carrier sent plaintiff a letter containing the following statements:

> We received notification of your need to take Family/Medical Leave due to:
>
> > *A serious health condition that makes you unable to perform the essential functions of your job.*
>
> You have been <u>approved</u> for leave under FMLA beginning May 25, 2007. Under Carrier's FMLA policy you are entitled to **up to sixteen (16) weeks** (640 hours) of job protected leave in a rolling twelve-month period. **Your doctor has not indicated when you will be able to return to work.**
>
> > ***Once you know your return to work date***, *you must provide that information to Human Resources in writing* <u>*BEFORE YOU RETURN TO WORK.*</u>
>
> If you have not done so already, your claim for Short Term Medical should be filed with Liberty. You must call them . . . to begin

---

[19]Plaintiff's evidentiary submission, Exhibit 7 (Certification of Health Care Provider), at 1 (footnote omitted).

[20]*Id.* (boldface emphasis supplied).

[21]*Id.* at 3.

the process.[22]

During his leave, plaintiff never submitted any additional leave forms and, specifically, he never requested that his leave be extended.  In fact, plaintiff did not communicate with Carrier at all during his leave.  Instead, he communicated solely with Liberty Mutual, the insurance company responsible for handling his claim for short-term disability benefits, and he assumed that Liberty Mutual would share any relevant communications with Carrier.  He formed that assumption because Ramona Thompson, a Human Resources Administrator for Carrier, had informed him that he should communicate directly with Liberty Mutual about his short-term disability benefits.[23]  Specifically, plaintiff testified that Thompson told him his "contact was going to be through Liberty Mutual."[24]  Another portion of plaintiff's deposition contains the following testimony:

> Q.     Okay.  Do you remember Ms. Thompson saying anything else while you guys were completing [the Request for Leave of Absence Form]?
>
> A.     She mentioned about contacting Liberty Mutual.
>
> Q.     That was for the short-term disability?

---

[22]Plaintiff's evidentiary submission, Exhibit 1 (June 13, 2007 letter) (all boldface emphasis supplied; all other emphasis in original).

[23]Rousseau Deposition, at 81-83, 95-96, 105-06, 138-39.

[24]*Id.* at 138-39.

A.      Yes.  She gave me the number and told me to contact them and —

Q.      That's this — go ahead.

A.      She sort of told me that it was one of those deals that I need to do, to contact Liberty Mutual.

Q.      In order to receive short-term disability?

A.      Yes.

Q.      Okay.  She made it clear that any questions, anything related to short-term disability, you were to contact Liberty Mutual; correct?

A.      My understanding of our conversation, she informed me that I would be dealing directly with Liberty Mutual.

Q.      I understand.

A.      So that's the way I understood it, that I would be dealing directly with them since they was Carrier's affiliate, something.  That was my understanding.

Q.      And my question is to deal with them for your short-term disability; correct?

A.      That and my leave, that's my understanding.  I thought it was my leave in general.

Q.      Okay.

A.      That they was [sic] contacting the plant with what I gave them, that was the way I took it.

Q.      Okay.

A.     I mean, I thought that I had did [sic] or completed what I needed to do at the plant and all my other dealings was [sic] going to be through Liberty Mutual.[25]

In accordance with his understanding, Plaintiff consistently communicated with Liberty at least once every month of his leave period.[26]

Plaintiff did not return to work on Friday, August 17, 2007, which was exactly twelve weeks from May 25, 2007, the date inscribed on the forms previously discussed as the date upon which plaintiff's leave commenced.[27]   Consequently, on the following Monday, August 20, 2007, Ms. Thompson informed Renee Knight, defendant's Human Resources Manager, that plaintiff had neither returned from leave, nor requested additional leave.[28]   Knight decided to give plaintiff two more days to return to work before she considered his absence  to be a voluntary resignation.

On Wednesday, August 22, 2007, when Carrier still had not heard from plaintiff, Knight concluded that plaintiff had either abandoned his job, or voluntarily resigned, and she consequently terminated plaintiff's employment.[29]   Knight, however, did not prepare a letter informing plaintiff of his termination until

---

[25]*Id.* at 81-83.

[26]*Id.* at 138-39.

[27]*Id.* at 95-96.

[28]Knight Declaration, at ¶ 13.

[29]*Id.* at ¶ 14.

September 5, 2007, fourteen days later (and nineteen days after plaintiffs August 17th leave end date).[30]   That letter stated, in pertinent part: "This letter is to inform you that your employment with Carrier Corporation has been terminated effective August 22nd due to your failure to return to work from a leave of absence."[31]

However, on that same date of September 5, 2007 — a date that was fourteen weeks and five days after the commencement of plaintiff's leave — plaintiff returned to Carrier's Scottsboro facility and requested a Return to Work form.   Knight told plaintiff that Carrier thought he had quit his job, but plaintiff denied quitting.   Instead, he explained that his doctor had not yet released him to return to work, but he expected the doctor to do so during an appointment scheduled for later that same day. Knight informed plaintiff she would have to talk to the corporate office about his continued employment.   A few days later, plaintiff received Knight's September 5 letter informing him that his employment had been terminated.[32]

## III. DISCUSSION

The FMLA grants an eligible employee the right to take up to twelve work weeks of unpaid leave annually for any one or more of several reasons, including "a

---

[30]*Id.* at ¶ 15.  Knight states that she prepared the letter on or soon after August 22, 2007, but simply did not mail the letter until September 5, 2007.  The letter, however, is dated September 5, 2007, so the evidence indicates that the letter was prepared on that date, or at least that Knight revised the date on the letter before she mailed it.

[31]Plaintiff's evidentiary submission, at Exhibit 8 (September 5, 2007 letter).

[32]Rousseau Deposition, at 94-97; Knight Declaration, at ¶ 15.

-14-

serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The Act creates a private right of action against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided by the FMLA.  29 U.S.C. §§ 2615(a)(1), 2617(a); *see also Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003); *Hurlbert v. St. Mary's Health Care*, 439 F.3d 1286, 1293-94 (11th Cir. 2006).  The Eleventh Circuit has recognized that "§ 2615(a) creates two types of claims:  '*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and *retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'"  *Hulbert*, 439 F.3d at 1293 (emphasis supplied) (quoting *Strickland v. Water Works & Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)) (internal citations omitted).  Plaintiff alleges both of these claim categories in the present action.

## A.    Plaintiff's Claim for Interference With His FMLA Rights

To establish an FMLA interference claim, "an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA."  *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008).  *See also* 29 U.S.C. § 2615(a)(1); *Strickland*, 239 F.3d at 1206-07.  An eligible employee who

takes FMLA leave is entitled to "any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3).  The employee need not "allege that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208.

Plaintiff claims that defendant denied him his full FMLA rights because it did not allow him to take ***sixteen weeks*** of unpaid leave, as stated in defendant's "Hourly Employee Guidelines"[33] defendant's June 13, 2007 letter (reiterating that Carrier employees were entitled to up to sixteen weeks of leave).[34]  Defendant argues that any claim for leave in excess of ***twelve weeks*** is not cognizable under ***the FMLA*** because the statute only provides for twelve weeks of leave.  In addition, defendant asserts that, because plaintiff's leave period in fact lasted for more than twelve weeks, it did not violate the FMLA when it terminated his employment for failing to return to work.

In his brief, "[p]laintiff does not dispute that the FMLA intends to guarantee twelve weeks [of leave], and no more, to an employee."  Doc. no. 25 (plaintiff's brief), at 13.  *See also* U.S.C. §2612; *Johnson v. Morehouse College,* 199 F. Supp. 2d 1345, 1357 (N.D. Ga. 2002) ("Under the FMLA, twelve weeks of leave is the

---

[33]*See* quoted text preceding note 9, *supra.*

[34]*See* quoted text preceding note 22, *supra.*

maximum leave period that the statute requires.").

Even so, plaintiff still asserts that his FMLA interference claim is viable because it "is not based upon an assertion that the FMLA provides for more than twelve weeks of leave, but rather that **Defendant represented to Plaintiff that the FMLA provided for sixteen weeks of leave, and thus attempted to interfere with Plaintiff's rights under the FMLA.**" Doc. no. 25 (plaintiff's brief), at 13 (emphasis in original).

Thus, there are two parts to plaintiff's theory. First, plaintiff asserts that defendant violated federal regulations when it twice informed him — in both defendant's "Hourly Employee Guidelines" and again in the letter issued to him on June 13, 2007 — that he was entitled to take up to sixteen weeks of leave. Specifically, plaintiff points to 29 C.F.R. § 825.300(c)(1), which provides:

> (1) Employers shall provide written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations. The employer is obligated to translate this notice in any situation in which it is obligated to do so in § 825.300(a)(4). This notice shall be provided to the employee each time the eligibility notice is provided pursuant to paragraph (b) of this section. If leave has already begun, the notice should be mailed to the employee's address of record. Such specific notice must include, as appropriate:
>
> > (i) That the leave may be designated and counted against the employee's annual FMLA leave entitlement if qualifying (see §§ 825.300(c) and 825.301) and the applicable 12-month period

for FMLA entitlement (*see* §§ 825.127(c), 825.200(b), (f), and (g));

(ii) Any requirements for the employee to furnish certification of a serious health condition, serious injury or illness, or qualifying exigency arising out of active duty or call to active duty status, and the consequences of failing to do so (*see* §§ 825.305, 825.309, 825.310, 825.313);

(iii) The employee's right to substitute paid leave, whether the employer will require the substitution of paid leave, the conditions related to any substitution, and the employee's entitlement to take unpaid FMLA leave if the employee does not meet the conditions for paid leave (*see* § 825.207);

(iv) Any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments (*see* § 825.210), and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

(v) The employee's status as a "key employee" and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial (*see* § 825.218);

(vi) The employee's rights to maintenance of benefits during the FMLA leave and restoration to the same or an equivalent job upon return from FMLA leave (*see* §§ 825.214 and 825.604); and

(vii) The employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave (*see* § 825.213).

29 C.F.R. § 825.300(c)(1).

This regulation does not support plaintiff's assertion that "[t]he very fact that Defendant misinformed Plaintiff of his rights under the FMLA constitutes interference."[35]   Plaintiff is not arguing (nor could he successfully argue) that defendant failed to provide him any notice of his obligations during FMLA leave; he only argues that the notice defendant provided contained some incorrect or, at least, misleading information.  The court can discern no basis in 29 C.F.R. § 825.300(c)(1) for asserting a claim of FMLA interference based upon the provision of incorrect or misleading information.

The second part of plaintiff's interference claim has more traction. He asserts that "Defendant's misrepresentation to Plaintiff also estops Defendant from now claiming that the FMLA's protections do not apply because [the FMLA] allows for only twelve weeks of leave."[36]   Courts in other circuits have applied an equitable estoppel theory to prevent an employer from limiting an employee's leave to twelve weeks under the FMLA when the employer had represented to the employee that he was entitled to more than twelve weeks of leave.  For example, in *Duty v. Norton-Alcoa Proppants,* 293 F.3d 481 (8th Cir. 2002), the plaintiff had received a letter from

---

[35]*Id.* at 14.

[36]*Id.* at 15.

his employer that reasonably could have been construed as allowing him thirty-four weeks of FMLA leave.  The Eighth Circuit held that the employee reasonably relied upon that letter to his detriment when he waited thirty-four weeks before attempting to return to work.  Consequently, the Eighth Circuit held that the employer was equitably estopped from arguing that the employee could not assert a claim for interference under the FMLA because he had taken more than the twelve weeks of leave permitted by the FMLA.  *Id.* at 493-94.  *See also Woodford v. Community Action of Greene County,* 268 F.3d 51, 57 (2nd Cir. 2001) (holding that "the doctrine of equitable estoppel itself may apply where an employer who has initially provided notice of eligibility for leave later seeks to challenge that eligibility"); *Dormeyer v. Comerica Bank-Illinois,* 223 F.3d 579, 582 (7th Cir. 2000) ("And so an employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of entitlement to family leave.") (citations omitted).

Defendant correctly points out that the Eleventh Circuit has not yet applied the doctrine of equitable estoppel in the FMLA context, at least not in the manner plaintiff suggests that it be applied here.  *See Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 797 n.4 (11th Cir. 2000) ("We decline to

-20-

speculate about what the result might be if there had been facts to support a detrimental reliance argument.").  Even so, there is nothing in the case law to suggest that the Eleventh Circuit would decide against recognizing the estoppel theory.[37] Therefore, this court concludes, consistent with the weight of the persuasive authority from other circuits, that plaintiff should be allowed to assert a theory of equitable estoppel to refute defendant's argument that the FMLA does not apply because plaintiff was absent from work for more than twelve weeks.

Furthermore, the court concludes that there are genuine issues of material fact with regard to whether the estoppel theory should apply under the facts of this case. "The principle of [equitable] estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." *Duty,* 293 F.3d at

---

[37]Other district courts within the Eleventh Circuit have declined to apply the equitable estoppel theory because the Eleventh Circuit has not yet ruled on the issue.  *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 797 n.4 (11th Cir. 2000) ("We decline to speculate about what the result might be if there had been facts to support a detrimental reliance argument.").  For this reason, other district courts within the Eleventh Circuit have rejected the doctrine.  *See, e.g., Green v. RJ Behar & Co.*, No. 09-62044-CIV, 2010 WL 1796570, *4 (S.D. Fla. May 4, 2010) ("Green provides no authority — statutory, regulatory or case law — for her implicit suggestion that R.J. Behar is estopped from denying her FMLA coverage. Noteworthy is the fact that the Eleventh Circuit has not applied the estoppel doctrine to the FMLA."); *Peery v. CSB Behavioral Health Systems*, No. CV106-172, 2008 WL 4425364, *13 (S.D. Ga. Sept. 30, 2008) ("[T]he Eleventh Circuit has yet to explicitly determine whether estoppel may be applied to FMLA eligibility certifications. . . .  Moreover, district courts within this circuit have consistently declined to apply the doctrine to the FMLA certification requirements. . . .  Based on this persuasive authority, this Court sees no reason to apply the doctrine here.") (citations omitted).  This court does not find this non-binding authority to be persuasive.

493-94 (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 659 (8th Cir.1992); *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984)). Here, a reasonable jury could reasonably conclude that defendant misrepresented to plaintiff the amount of leave he was entitled to take. Defendant's June 13, 2007 letter informed plaintiff that he was entitled to take up to sixteen weeks of leave when, in reality, defendant only intended to provide employees located within the State of Connecticut with sixteen weeks of leave, and that was only because a Connecticut state law required defendant to do so. Plaintiff unquestionably relied upon defendant's representations to his detriment, because he did not return to work within the statutory twelve-week period, but did so within the sixteen weeks stated in defendant's written materials, and was terminated as a result.

Furthermore, a reasonable jury could conclude that plaintiff's reliance upon defendant's statement in the June 13, 2007 letter — that plaintiff was entitled to up to sixteen weeks of leave — was reasonable, especially when coupled with the provision of the "Hourly Employee Guidelines" stating the same thing. While other documents in plaintiff's file — including the "Request for Family Medical Leave of Absence" form, the "Request for Leave-of-Absence" form, and the "Certification of Health Care Provider" completed by plaintiff's physician — may have indicated that he was entitled to only twelve weeks of leave, all of those documents were issued

-22-

*before* the June 13, 2007 letter.  Plaintiff could reasonably have concluded that the subsequently-issued June 13 letter controlled and, therefore, that he was entitled to four more weeks of leave than had been mentioned in the earlier forms.

Additionally, a reasonable jury could conclude that plaintiff reasonably relied upon representations made by Carrier in concluding that his communications with Liberty Mutual satisfied all of his reporting obligations during his leave period.  It is true that the Notice of Intent to Return from Leave and Request for Leave-of-Absence forms both state that plaintiff must inform Carrier of his medical status every thirty days.  Even so, *while plaintiff was working with Ms. Thompson to complete the Request for Leave of Absence form,* Thompson informed him that he should be directing all communications to Liberty Mutual during his leave.  Therefore, even though the Request for Leave-of-Absence form itself directed employees to communicate directly with Carrier, plaintiff could have reasonably relied upon Thompson's unclear directions to form a contrary conclusion.

In summary, because material issues of genuine of fact exist with regard to whether plaintiff reasonably relied on defendant's representations to his detriment, the theory of equitable estoppel applies to prevent defendant from asserting that plaintiff's FMLA claims are not viable, simply because plaintiff took more than twelve weeks of leave.

**B.     Plaintiff's Claim for FMLA Retaliation**

In order to establish a claim for FMLA retaliation, "an employee must show that his employer intentionally discriminated against him for exercising an FMLA right." *Martin*, 543 F.3d at 1267; *see also* 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).  Unlike an interference claim, an employee "bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted).

### 1.     Plaintiff's retaliation claim is cognizable even though he took more leave than he was entitled to take under the terms of the FMLA.

Defendant first argues that plaintiff's retaliation claim cannot survive because plaintiff took more leave than he was entitled to take under the FMLA. Defendant relies upon the decision of the Northern District of Georgia in *Johnson v. Morehouse College,* 199 F. Supp. 2d 1345 (N.D. Ga. 2002).  There, the court identified "the typical FMLA retaliation scenario" as one "in which an employer sanctions an employee, either after the latter has been granted permission for FMLA leave in the future or has returned to work following the completion of the FMLA leave."  *Id.* at 1361 (citing *Brungart*, 231 F.3d at 794).  However, the court contrasted that typical scenario with the one before it, noting that the plaintiff's retaliation claim appeared

to be

> little more than a rehash of her substantive FMLA claim.  In essence,
> she argues that defendant was not permitted to fire her as a result of her
> refusal to return to her job because this refusal was warranted by the
> FMLA.  But that is just another way of saying that the FMLA permitted
> plaintiff to remain off the job for over five months after the birth of her
> child: an argument that this Court has roundly rejected in the preceding
> discussion.  Obviously, as long as the employee has been given the
> requisite leave period under the FMLA, the FMLA does not forbid an
> employer from firing an employee who simply refuses to come back to
> work, as did this plaintiff.  Thus, by firing plaintiff, defendant did not
> discharge her for opposing any practice made unlawful by the FMLA.
> *See* 29 U.S.C. § 2615(a)(2).  Defendant terminated plaintiff because she
> refused to come back to work and, as discussed *supra*, the FMLA
> provides no protection for such recalcitrance.

*Johnson,* 199 F. Supp. 2d at 1360-61 (footnote omitted).

Here, unlike in *Johnson,* the court has already held that, due to plaintiff's reasonable reliance on defendant's misrepresentations, plaintiff is entitled to more than twelve weeks of protected leave.  As discussed above, the equitable estoppel theory precludes defendant's argument.

### 2.    Merits of retaliation claim

Furthermore, the court concludes there are genuine issues of material fact with regard to whether plaintiff can prevail on the merits of his FMLA retaliation claim. Where, as here, the plaintiff seeks to prove retaliation with circumstantial evidence, the court must analyze the case using the burden-shifting framework first articulated

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for use in Title VII cases.  Under that framework, the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonable factfinder to determine that he has satisfied the elements of a *prima facie* case.  Once the plaintiff has done so, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the employment decision.  If defendant does so, then the burden shifts back to plaintiff to demonstrate that defendant's proffered legitimate, non-retaliatory reasons are actually a mere pretext for retaliation.  *Id*. at 802.

Here, plaintiff has presented sufficient evidence to support a *prima facie* case of retaliation under the FMLA.  The  *prima facie* case  requires a showing that:  (1) the employee engaged in statutorily protected conduct; (2) the employee suffered an adverse employment action; and (3) there is a causal connection between the two. *Smith v. BellSouth Telecommunications, Inc*., 273 F.3d 1303, 1314 (11th Cir. 2001). Plaintiff engaged in statutorily protected conduct by requesting and taking FMLA leave.  His entire leave period was protected, even though it exceeded twelve weeks, because he reasonably relied upon defendant's representations that he was entitled to up to sixteen weeks of leave.  Furthermore, plaintiff suffered an adverse employment action when his employment was terminated.  Finally, there is evidence to support a causal connection between plaintiff's protected conduct and the termination of his

employment.  To establish a causal connection at the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").  *See also*, *e.g.*, *Gupta*, 212 F.3d at 590 ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins*., 197 F.3d 1322, 1337 (11th Cir. 1999)).  "Close temporal proximity between the protected activity and the adverse action *may* be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Commissioners,* 256 F.3d 1095, 1119 (11th Cir. 2001) (citing *Gupta*, 212 F.3d at 590) (emphasis supplied).  Here, Carrier undeniably was aware of plaintiff's protected conduct, because it received his requests for leave and approved them.

Furthermore, the fact that plaintiff's employment was terminated *while he was still out on leave* strongly indicates causation.

Defendant asserts that it terminated plaintiff's employment "based on its good faith belief that Plaintiff had resigned or abandoned his job."[38]  That is a legitimate, non-retaliatory reason for the termination decision.  Accordingly, the burden shifts to plaintiff to "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Quarreling with that reason is not sufficient.") (internal citation omitted).  The plaintiff shoulders this burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs*, 106 F.3d at1528 ( citation omitted); *see also Silvera v. Orange County School Board*, 244 F.3d

---

[38]Doc. no. 24 (defendant's brief), at 16.

1253, 1258 (11th Cir. 2001).

Plaintiff has satisfied that burden here. According to plaintiff, because defendant's Hourly Employee Guidelines and its June 13, 2007 letter both alluded to a sixteen-week leave period, he should not be terminated for failing to return to work after only twelve weeks. Plaintiff is correct that the June 13 letter caused much confusion about the length of his leave period, and the court has already determined that plaintiff could reasonably have relied upon the statements made in that letter. Because defendant gave plaintiff inconsistent deadlines for returning to work, their proffered reason for terminating plaintiff's employment is not entirely credible.

In summary, there are genuine issues of material fact with regard to whether plaintiff established a *prima facie* case of retaliation, and whether defendant's proffered legitimate, non-retaliatory reasons for terminating plaintiff's employment actually were a mere pretext for retaliation. Accordingly, summary judgment is due to be denied on plaintiff's retaliation claim.

## IV. CONCLUSION AND ORDER

Based on the foregoing, the court concludes there are genuine issues of material fact with regard to plaintiff's interference and retaliation claims under the FMLA. Accordingly, defendant's motion for summary judgment is DENIED. This case will be set for pre-trial conference and trial by separate order.

DONE this 7th day of March, 2011.

_____

United States District Judge